**E-FILED on** 02/25/09

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RITA BALDWIN and JUSTIN CHOI,<br><br>Plaintiffs,<br><br>v.<br><br>MATTHEW CATE, MICHAEL JOSEPH CASTRO, DEBBIE RIVES, C. SCOTT HARRIS, JR. and DOES 1-25,<br><br>Defendants. | No. C-08-03516 RMW<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR INJUNCTIVE RELIEF<br><br>**[Re Docket No. 48]** |

    Plaintiffs Rita Baldwin ("Baldwin") and Justin Choi ("Choi") seek injunctive relief pursuant to 42 U.S.C. § 1983 to prevent violations of their constitutional rights that, they allege, arise out of the inadequate training of California Department of Corrections and Rehabilitation ("CDCR") agents. The court granted defendants' motion to dismiss plaintiffs' first amended complaint on November 5, 2008. Defendants now move to dismiss plaintiffs' second amended complaint, again contending that plaintiffs: 1) have no standing to seek an injunction; and 2) have an adequate legal remedy. For the following reasons, the court grants the motion.

# I. BACKGROUND

The facts of this case are set forth in this court's prior order granting defendants' motion to dismiss the first amended complaint. *See Baldwin v. Cate,* 2008 WL 4811460, *1 (N.D.Cal. 2008). Briefly, on July 2, 2004, Edward Biscovich ("Biscovich") escaped from the California Medical Facility. As part of the investigation into his whereabouts, Biscovich's sister-in-law informed CDCR agents that she had received a call from a telephone number that she did not recognize. *Baldwin v. Dangerfield*, N.D.Cal. Case No. 06-2467, Order Granting In Part and Denying In Part Cross Motions for Summary Judgment, Docket No. 86. That call was traced to Baldwin's residence in Morgan Hill. *Id.* On July 6, 2004, agents from the CDCR allegedly entered Baldwin's backyard as part of a search for the escaped convict without a search warrant, without probable cause, and without Baldwin's consent. Second Amended Complaint ¶¶ 18-20 ("SAC"). Plaintiffs filed a damages action in federal court on April 7, 2006 challenging, among other things, the entry into the backyard, and were awarded summary judgment on the backyard entrance. Plaintiffs here seek to enjoin defendants from "training CDCR agents to enter the curtilage of a private citizen's home without a warrant, consent, or probable cause in violation of the right to be free from unreasonable searches as guaranteed by the Fourth Amendment . . . ." SAC ¶ 44.

This court previously dismissed this action for lack of standing to seek an injunction, finding that plaintiffs had not pled sufficient facts to satisfy the Supreme Court's requirement that they establish a sufficient likelihood of future harm. *Baldwin v. Cate,* 2008 WL 4811460 at *1. Plaintiffs filed their SAC on November 25, 2008.

# II. ANALYSIS

Defendants move to dismiss, arguing first that plaintiffs have no standing under Article III of the Constitution to seek injunctive relief, and second that plaintiffs have an adequate legal remedy. The court considers each argument in turn.

### A.   Standing to Seek Injunctive Relief

As set forth in the court's previous order granting defendants' motion to dismiss, to establish standing to seek an injunction, a plaintiff must demonstrate "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). To do so, a

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR INJUNCTIVE RELIEF—No. C-08-03516 RMW
JAS                                                                                                  2

plaintiff must allege a "real and immediate" threat of repeated harm that is not merely conjectural or hypothetical. *Id.* at 102. Past exposure to illegal conduct does not alone show that threat if unaccompanied by any continuing, present adverse effects. *Id.*

A plaintiff can show that future harm is likely to recur in at least the following ways. First, plaintiff can demonstrate that "the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy." *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001). That is, when the harm alleged is directly traceable to a written policy, there is an implicit likelihood of its repetition in the immediate future. *Id.* Second, a plaintiff may also establish a likelihood of harm by demonstrating that the harm is part of a "pattern of officially sanctioned behavior" violative of the plaintiffs' federal rights. *Id.* (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)).

The SAC provides additional factual detail in support of standing. The SAC states that defendants fail to train CDCR agents with respect to "the area adjacent to his or her home that is (a) used for domestic activities associated with the intimacy of the home, (b) enclosed, and (c) protected from observation." SAC ¶ 23. The SAC also alleges that the concept of a heightened expectation of privacy in such areas is not found in CDCR training materials, nor is that concept taught to CDCR agents. *Id.* The SAC attaches over 140 pages of that training material.

The SAC also alleges sworn statements by defendant Michael Castro ("Castro"), the Administrator of the Office of Correctional Safety, and Agent John Jefferson ("Jefferson"), the agent who entered Baldwin's backyard, that what they did was standard practice. Castro is the CDCR's lead instructor on search policies, procedures, and law, and administrator of the Fugitive Apprehension Team. *Id.* at ¶ 8. According to the complaint, Castro said in his statement that it is "'standard' to place an agent in the rear of a residence to cover back exits, with or without a warrant." *Id.* at ¶ 25. He has also stated under oath that agents are trained to enter fenced backyards, and that it is "standard procedure" to do so. *Id.* at ¶ 26. Finally, Castro stated that agents are not instructed that citizens have an expectation of privacy in enclosed areas surrounding their homes. *Id.* at ¶ 27. Jefferson, like Castro, explained that placing an agent in the backyard is indeed standard procedure. *Id.* He also said that "I did not think that we needed or that I needed a warrant to enter the backyard." *Id.* at ¶ 30.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR INJUNCTIVE RELIEF—No. C-08-03516 RMW
JAS                                   3

### 1. Written Policy

As the Ninth Circuit wrote in *Armstrong*, "a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy. In other words, when the harm alleged is directly traceable to a written policy." 275 F.3d at 861.  The court in *Armstrong* considered whether the written policy of the Board of Prison Terms satisfied the Americans with Disabilities Act and the Rehabilitation Act. *Id.*  Though the policy was formulated to ensure that prisoners and parolees received due process, the court concluded that the policy "does not consider the particular needs of disabled prisoners and parolees" and that it did "little, if anything, to address the needs of prisoners or parolees who have problems understanding complex information or communicating..." *Id.* at 862.  Finding the policy deficient under the ADA, the court wrote that "as a general rule, injuries can stem from a failure to take action as well as from affirmative conduct." *Id.* at 863.

Plaintiffs allege that the CDCR's training materials do not include the concept of heightened privacy in areas adjacent to a home.  Defendants respond first that the SAC fails to allege the existence of a written policy. The complaint alleges that, in combination, the alleged constitutional violations, Castro's admission that similar acts are part of an agent's training, and the lack of relevant instruction in the training materials "together reflect a written policy to allow CDCR agents to violate the Fourth Amendment rights of private citizens...." SAC ¶ 36.  Though the documents attached to the complaint are not clearly organized, and some appear to be incomplete, it does not necessarily follow that no "written policy" exists.  Plaintiffs' argument seems to be that affirmative instruction on Fourth Amendment requirements which fails to instruct on privacy rights in the curtilage surrounding a home is a defective written policy.  In *Armstrong* the court found a written policy reflected in a combination of documents.  It wrote that "[t]he Board's written policy is primarily contained in three documents: its Self-Evaluation and Transition Plan, its Administrative Directive, and its training documents, including guidelines provided to Department employees." Plaintiffs' allegations of a written policy are sufficient from a pleading standpoint.

Defendants argue in their reply that the training materials do in fact include "terms and phrases which encompass similar concepts and describe areas around a home." Reply to Opp'n 5.

The reply goes on to list a series of bates-numbered pages where these terms or concepts appear. *Id.* While various related terms do appear on those pages, none of them seems to deal with the heightened expectation of privacy citizens might expect in enclosed areas near the home. Moreover, the included materials do not appear to address the constitutionality of searching such areas.

### 2. Pattern of Officially Sanctioned Violative Behavior

Plaintiffs allege that Agent Jefferson entered plaintiffs backyard "as a part of a pattern of officially sanctioned behavior . . ." SAC ¶ 22. And indeed, as stated above Castro and Jefferson both stated under oath that such entries are "standard" and that they were unaware that a warrant was necessary in order to enter a backyard. *Id.* at ¶¶ 25-30. Castro even stated that agents are trained to enter "fenced areas of the premises." *Id.* at ¶ 27. Although plaintiffs do not specifically allege any particular past act, the allegations in the complaint adequately plead a past pattern of officially sanctioned behavior.

### 3. Other Considerations

Although a written policy or officially sanctioned behavior may suggest a likelihood of repetition, it does not necessarily mean that the plaintiffs themselves are likely to suffer another similar constitutional injury. Here, the likelihood of plaintiffs experiencing a similar injury in the future is remote. Plaintiffs rely on *Armstrong* to argue that they can nonetheless satisfy Article III standing requirements. But such an interpretation of *Armstrong* is in conflict with the Supreme Court's requirement that plaintiff "demonstrate a sufficient likelihood that he will be wronged again in a similar way." *Lyons*, 461 U.S. at 111. In *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004) the court considered whether a single disabled plaintiff had standing to seek an injunction against a movie-theater chain. The court noted that AMC had a written policy "that fails to ensure that wheelchair-bound patrons are able to sit with their companions when the screening in question is sold out." *Id.* at 1081. The court then went on to consider the likelihood that the individual plaintiff would again suffer a similar injury; an unnecessary analysis if an injury stemming from a written policy alone satisfies *Lyons*. *Id.* Moreover, *Armstrong* itself does not do away with the requirement of the likelihood of future injury to plaintiff. In both *Armstrong* and

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR INJUNCTIVE RELIEF—No. C-08-03516 RMW
JAS                    5

*Hawkins v. Comparet-Cassini*, 251 F.3d 1230 (9th Cir. 2001), the case *Armstrong* relies on for the written-policy rule, the court analyzed whether *a class* would likely suffer a similar future injury.

When a case is brought as a class action, the standing inquiry is directed to whether the class has standing to raise its constitutional claim for injunctive relief. *LaDuke*, 762 F.2d at 1326. That is, the standing inquiry is whether *the class*, as opposed to an individual plaintiff, faces a credible threat of recurring injury. *Id.* When standing is so considered, it is only sensible that the named plaintiffs be competent to represent broader interests than their own. *See Hawkins*, 251 F.3d 1230 (9th Cir. 2001) (pointing out that although plaintiff had to establish standing before obtaining class certification, it was relevant that the case was brought as a class action.).

*Armstrong* holds that, in certain circumstances, *Lyons*' requirement that plaintiff show a substantial likelihood of future injury can be implied. But *Armstrong* does not eliminate that requirement. Both *LaDuke* and *Hawkins* consider with some care the likelihood of plaintiffs suffering a future harm. *LaDuke*, 762 F.2d at 1326 ("Class members have and will continue to be aggrieved by the defendants' unconstitutional pattern of conduct in contravention of the Fourth Amendment."); *Hawkins*, 251 F.3d at 1237 ("Under the Sheriff's policy, Hawkins needed only to enter a Los Angeles courtroom to justify use of the belt. As his history demonstrates, this prospect was not remote. Even now, Hawkins may wish to pursue state habeas claims or seek other post-conviction relief that would bring him once more before the Los Angeles courts.").

The cases illustrate that there are two aspects of the probability of future injury, both of which must be satisfied under *Lyons*: 1) the likelihood that the defendant will violate similar rights in the future; and 2) the likelihood that plaintiffs (whether an individual or a class) will suffer that rights violation. *Lyons* focused on this distinction in holding that "[a]lthough [Lyons] alleged that the City authorized the use of control holds in situations where deadly force was not threatened, it did not indicate why Lyons might realistically be threatened by police officers who acted within the strictures of the City's policy." *Lyons*, 461 U.S. at 106. *Armstrong* was concerned with the first of the two probabilities: repetition of defendants' violative conduct. Under *Armstrong*, then, when a written policy or a past pattern of officially sanctioned behavior exists, a court can sensibly assume that a defendant will act similarly in the future. But without showing that plaintiffs themselves are

likely to be subject to that policy or pattern, plaintiffs still lack injunctive standing. In this case, then, plaintiffs must show that they are likely again to be the subject of defendants' challenged action.

Baldwin, at oral argument on the motion to dismiss, seemed to concede that plaintiffs must show that they themselves are likely to be subject to a future intrusion into their home or its curtilage. She argued, however, that because, as a Bankruptcy attorney, she frequently makes unsolicited telephone calls like the one that apparently brought CDCR agents to her home, she is likely to suffer a similar constitutional injury in the future. The court does not find this argument persuasive. Merely because a person has reason to make or receive unsolicited telephone calls does not mean the police are more likely to investigate who is in her home any more than someone else's home.

Since it appears extraordinarily unlikely that Baldwin and Choi will again suffer any similar constitutional injury, they lack standing to seek an injunction. A plaintiff's inability to obtain injunctive relief when future injury is not likely does not mean that federal law will have no deterrent effect in these circumstances. Such a plaintiff has a damages remedy under § 1983. *See Lyons*, 461 U.S. at 112-13. Furthermore, a person who deliberately deprives a citizen of his constitutional rights risks conviction under the federal criminal laws. *Id*.

**B.     Plaintiffs Damages Action Provides An Adequate Legal Remedy**

To support an action for injunctive relief, plaintiffs must show that without it, they will suffer irreparable injury, and that they have no adequate remedy at law. *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994). For the single instance of alleged violation of their constitutional rights, Baldwin and Choi have an adequate remedy in their damages action. However, because plaintiffs do not plead facts sufficient to show that they are likely to suffer further injury, any recovery in their damages suit will constitute an adequate remedy.

### III. ORDER

For the reasons set forth above, the court grants defendants' motion to dismiss. Since plaintiffs have had an opportunity to amend and a further opportunity would appear to be futile, the motion to dismiss is granted with prejudice.

DATED:     02/25/09

RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

| | |
|---|---|
| Aengus Hartley Carr | accar@mayerbrownrowe.com |
| Donald M. Falk | dfalk@mayerbrown.com |
| Jason Adam Wrubleski | jwrubleski@mayerbrown.com |
| Lee H. Rubin | lrubin@mayerbrown.com |
| Rena Chng | rchng@mayerbrown.com |

**Counsel for Defendants:**

| | |
|---|---|
| Troy Bentley Overton | troy.overton@doj.ca.gov |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**   02/25/09                                              JAS
                                                        **Chambers of Judge Whyte**

---

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR INJUNCTIVE RELIEF—No. C-08-03516 RMW
JAS                                                              9